IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 09-cv-02029-MSK-KMT

WILFRIDO HERNANDEZ,

Plaintiff,

v.

CASTLE ROCK INDUSTRIES, INC., a/k/a KARCHER FLOOR CARE, INC., WINDSOR INDUSTRIES, INC.,

Defendants.

---

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment **(#31)**, to which Plaintiff Wilfrido Hernandez responded **(#34)**, and Defendant replied **(#37)**. Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

## I. Jurisdiction

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## II. Issue Presented

Plaintiff asserts that Defendant Castle Rock Industries, Inc., a/k/a Karcher Floor Care, Inc. ("Karcher") discriminated against him by terminating his employment on account of his race/national origin. He further contends that he was unlawfully terminated in retaliation for engaging in activities that further public policy. Karcher moves for summary judgment on all claims.

## III. Material Facts

The Court has reviewed all of the parties' submissions. For purposes of this Motion only, the Court construes all disputed facts most favorably to the Plaintiffs. Viewing the facts in such light, the material facts are as follows.

Karcher is a German company that manufactures floor care equipment and pressure washers. Plaintiff was employed at Karcher's manufacturing facility in Englewood, Colorado. During the relevant time period Plaintiff worked in the receiving department and was a "Lead" employee with supervisory responsibilities. Plaintiff reported to Mike Aranda. Plaintiff is of Mexican origin. Mr. Aranda identifies himself as of Mexican and Native American origin. Plaintiff and Mr. Aranda had a good working relationship and socialized outside of work.

Karcher's computer system used an operating system called MAPICS during the relevant time period. Mr. Aranda gave his MAPICS password to many of his Lead employees, including Plaintiff, so that they could have access to the programs used on the system. One of those programs was called Kronos, which was used for timekeeping. Hourly employees at Karcher could punch in and out using various methods but if they made a mistake, such as forgetting to punch out, a supervisor would have to go into the Kronos system to make the correction. Employees usually filled out a Time Adjustment ("TA") request form, but requests might also be conveyed verbally. Mr. Aranda was responsible for making adjustments to his employees' time records but delegated that responsibility to Plaintiff. Plaintiff was therefore trained and experienced with the Kronos system and knew how to use it to view and edit time entries.

In July 2007, two employees, Liliana Mendez and Maria "Hilda" Munoz told Plaintiff that they believed their Lead in the shipping department, Bernadette Sandoval, was failing to

clock in at the start of her shift.[1] Plaintiff states that on July 10, 2007, he went to Ms. Sandoval's work area around 5:15 a.m. to give her some paperwork but did not find her there and did not see that her computer was on. He claims he then reviewed Kronos to determine if Ms. Sandoval had clocked in and saw no time entry for her. He later viewed Kronos again and saw that Ms. Sandoval's time report indicated she had clocked in at 5:00 a.m. Ms. Sandoval had been given Mr. Aranda's MAPICS password but had not been trained on the Kronos system.

Later that day, Plaintiff approached Mr. Aranda and stated his suspicion that Ms. Sandoval had altered her time records, based on his observation that she was not there at 5:15 and had not clocked in thereafter, but later her time record showed a clock-in time of 5:00 a.m. Mr. Aranda told Plaintiff to continue to monitor the situation. The next day, Mr. Aranda pulled up Ms. Sandoval's recent time records and reviewed some of them with Plaintiff. Plaintiff told Mr. Aranda that he had occasionally made some corrections to Ms. Sandoval's time records at her request but could not say with certainty which of the edits in the records he had done.

Several days later, on July 13, 2007, Ms. Mendez and Ms. Munoz approached Neal Necastro, the Vice President of Operations and plant manager, about Ms. Sandoval's alleged improper timekeeping. They gave Mr. Necastro four separate screen prints showing Ms. Sandoval's time entries for the week of July 9 - 13 as evidence of Ms. Sandoval's wrongdoing. The documents showed that Ms. Sandoval's clock-in time on July 13 had been changed from 5:49 to 5:00 a.m. However, when the two employees were questioned about the documents it became apparent that they did not know how to interpret the screen prints; in addition, the records were of a type that required supervisory level access, which these employees did not

[1] Plaintiff had previously worked as the Lead in that department and recommended Ms. Sandoval replace him when he was transferred to the receiving department.

have. Mr. Necastro concluded that these employees could not have obtained these documents on their own. Mr. Necastro informed Mr. Aranda of the accusation.

Mr. Aranda called Ms. Sandoval into his office to question her about the alleged improper record editing. Ms. Sandoval denied changing her time records and stated that she did not know how to do this. Mr. Aranda thought she appeared to be genuinely confused by the accusation, but nonetheless suspended her for three days pending an investigation.

Mr. Aranda requested records from the company's IT department. It was determined that the changes to Ms. Sandoval's time record for July 13 had been made at 5:51 a.m. by a user logged on to the MAPICS system using Mr. Aranda's password. The records showed that Ms. Sandoval's computer was booted up at 5:50:22 on that day. Mr. Aranda at some point tested how long it took his computer to load its programs after booting up and determined that it took over three minutes. After Ms. Sandoval returned from her suspension, Mr. Aranda had Ms. Sandoval also boot up her computer and then open programs to perform tasks.[2] He discovered that it took over three and a half minutes from boot up to when the programs became operational on Ms. Sandoval's computer. Based on the records showing that her computer was not booted up until 5:50 on July 13, Mr. Aranda determined Ms. Sandoval could not have made a change to her time entry at 5:51.[3] He therefore concluded that another employee had made the edits.

Issues relating to Ms. Sandoval and her time keeping escalated when on July 18, 2007, a petition was anonymously placed in the office a human resources department employee. The petition stated the following:

---

[2]He did not have her open or use the Kronos system during this exercise.

[3]Mr. Aranda did not consider the possibility that Ms. Sandoval could have used another computer that was already running while hers was booting up.

> As Windsor employees, we feel like people are getting special treatment. For example, Bernadette Sandoval, to our knowledge has been suspended on five different occasions. Yet, she is still the lead in the shipping department. If we are supposed to lead by example, what kind of example is that? Bernadette has had many issues with her attendance and also has access to Mike Aranda's password to Kronos. She was clocking herself in earlier than she was arriving and she was clocking herself out later than she was leaving. There are many witnesses to the times she has been arriving and leaving from work. If she denies this and tries to blame others, then we would like this fully investigated.

Ex. 9 to Def.'s Mot. for Summ. J., # **31-9**. The petition was signed by a number of employees, including Plaintiff. It appears that there had been a number of personality conflicts in the shipping department, particularly among Ms. Sandoval, Ms. Mendez, and another employee. The petition raised two concerns for the company– whether Ms. Sandoval really was improperly altering her time records and the disruptive and divisive effect of the petition.

Mr. Aranda and Donita Gardner, the Human Resources Director, interviewed a number of employees on July 19 and 20 to try to determine what had happened on July 13. Ms. Mendez was asked how she had obtained the Kronos printouts she had presented to Mr. Necastro. She initially claimed she had found them in the trash but when the interviewers expressed their skepticism at this she stated she had received them from Plaintiff.[4] Plaintiff made inconsistent statements regarding whether he had ever changed Ms. Sandoval's time records, stating at one point that he had occasionally made corrections she requested and at another time stating he had never done so.[5] The employees interviewed stated that they had no direct knowledge of Ms.

---

[4]In her deposition as part of this litigation, Ms. Mendez stated that perhaps she had actually received the printouts from another Lead employee, but throughout the investigation she always maintained that she received them from Plaintiff.

[5]In her deposition, Ms. Sandoval stated that she usually went to Mr. Aranda to make corrections and in July 2007 had not asked Plaintiff to make an edit for several months.

Sandoval changing her time records and had never seen her working on a computer other than her own. Plaintiff denied giving the screen prints to Ms. Mendez and Ms. Munoz and denied altering Ms. Sandoval's records.

Based on the investigation, Ms. Gardner and Mr. Aranda concluded that Plaintiff[6] was the only employee who had the knowledge and experience to change the time records so quickly on July 13, that he had given screen prints of the edited records to Ms. Munoz and Ms. Mendez, and that he was logged into his computer at the time the four printouts were made. They therefore determined that Plaintiff had falsified company records in order to make it appear that another employee was guilty of misconduct and had involved other employees in this effort. In view of his position as a Lead employee, the decision was made to terminate Plaintiff's employment.

In the course of the investigation it was also determined that Ms. Mendez had created and circulated the petition. This was determined to amount to a violation of rules concerning disruption of the workplace and, as a result, Ms. Mendez was suspended. No other disciplinary action was taken with respect to the petition.

**IV. Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that

---

[6]The investigators believed that only three employees had both the access and knowledge to make the changes to the Kronos system: Plaintiff and two other employees, also of Hispanic origins. The other two employees were ruled out for various reasons.

must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

When the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

When the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a

matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## V. Analysis

Karcher argues that it had legitimate, non-discriminatory reasons for terminating Plaintiff's employment and that he cannot demonstrate a genuine issue of material fact sufficient to demonstrate that these reasons were pretextual. Karcher further argues that Plaintiff's claim of discharge in violation of public policy fails as a matter of law.

### A. Discrimination in Termination Decision

A plaintiff alleging employment discrimination may prove intentional discrimination by direct or indirect evidence. In the absence of direct evidence, the analysis set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-804 (1973), provides the framework for assessing indirect, or circumstantial, evidence. *Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1226 (10th Cir. 2000). Under this analysis, the plaintiff bears the initial burden of presenting a *prima facie* case of discrimination. *Kendrick*, 220 F.3d at 1226. The essential purpose of the *prima facie* test is to eliminate "the most common nondiscriminatory reasons for the plaintiff's rejection." *Id*. at 1227 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981)). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. *Kendrick*, 220 F.3d at 1226 (quoting *McDonnell Douglas*, 411 U.S. at 802).

If the defendant presents such a reason, the plaintiff bears the "ultimate burden" of establishing that these proffered reasons are a pretext for unlawful discrimination. *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1167 (10th Cir. 2000). The plaintiff must show pretext by demonstrating that the defendant was more likely motivated by a discriminatory reason or that

the defendant's proffered reason "is unworthy of credence." *Id*. (quotation omitted); *see also Kendrick*, 220 F.3d at 1230 (three ways of showing pretext are: (1) evidence that the defendant's stated reason for the adverse action was false; (2) evidence that the defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or practice when making the adverse decision).

Plaintiff offers no direct evidence of discriminatory motive; thus, the indirect analysis of *McDonnell Douglas* applies here. Karcher does not dispute for the purposes of summary judgment that Plaintiff can establish his *prima facie* case of discrimination, but argues that the undisputed facts establish that it had a legitimate, nondiscriminatory reason for the discharge. Specifically, Karcher asserts that after a reasonable investigation it had evidence indicating that Plaintiff had engaged in serious misconduct by falsifying another employee's time record, sharing time records with other employees, and attempting to make it appear that another employee had engaged in improper conduct, and had been untruthful in the company's investigation.

Plaintiff does not dispute that these were the reasons given for his discharge but claims that the decision was nonetheless discriminatory. When asked about this in his deposition, Plaintiff stated that he believed the decision was motivated by his race/national origin because of the following: (1) other employees who had engaged in misconduct had not been fired[7]; (2) Ms.

---

[7]Karcher demonstrates in its motion for summary judgment that these employees were not similarly situated to Plaintiff in that they were not lead employees and/or had not engaged in conduct involving dishonesty. Moreover, several of the employees identified by Plaintiff are also Hispanic or of similar national origin. Plaintiff does not appear to dispute this in his response brief and so the Court concludes that there is no genuine issue of material fact regarding whether similarly situated employees who were not in Plaintiff's protected class were given more favorable treatment than he was.

Gardner should have required a more thorough investigation; (3) the company should not have believed Ms. Mendez instead of him regarding how she had obtained the Kronos reports, given his history of trustworthiness; (4) Mr. Aranda changed his behavior towards Plaintiff in the days preceding the termination; (5) Plaintiff was not told in advance that he would be discharged. In his response brief, Plaintiff focuses primarily on the adequacy of the investigation and whether there are facts to show that the decisionmakers were unreasonable in determining that Plaintiff engaged in misconduct.

Plaintiff argues that the evidence shows that Plaintiff had an excellent work history and was a trusted employee but that Ms. Sandoval had a long history of performance counseling related to attendance problems. In addition, Ms. Sandoval had Mr. Aranda's MAPICS password and so plausibly could have changed her time records herself. Plaintiff offers evidence from depositions taken during this litigation in which various employees gave statements indicating that Ms. Sandoval knew how to make edits in Kronos. There is no evidence, however, that this information was given to the investigators at the time of the decision to discharge Plaintiff. Plaintiff also argues that it was possible that Ms. Sandoval had made the edits to her time records on July 13 by using another computer that was already running; however, the evidence appears to be undisputed that the investigators were told that Ms. Sandoval was not seen using any computer but her own.

Plaintiff also contends that the investigation was flawed because the investigators never understood what would have motivated Plaintiff to set up Ms. Sandoval, although Ms. Gardner speculated that he may have done it at Ms. Mendez's behest. Plaintiff points out that Ms. Sandoval had a financial motive to alter her time records because she could earn overtime for hours she did not work, which further supports the theory that Ms. Sandoval herself changed the

records. Plaintiff also argues that the company should have focused on all of Ms. Sandoval's time records instead of just focusing on the July 13 records. However, Plaintiff does not address the fact that he had told Mr. Aranda that he might have made some legitimate edits to Ms. Sandoval's time and could not state which changes were authorized and which were not. Plaintiff further offers a speculative theory that Mr. Aranda, a Hispanic, was biased towards Ms. Sandoval, who also identifies as Hispanic and against Plaintiff, possibly because of a social relationship with Ms. Sandoval's boyfriend; alternatively, Plaintiff suggests that Mr. Aranda himself made the changes to Ms. Sandoval's time and covered it up by blaming Plaintiff.[8]

Plaintiff's arguments and alternative theories are not sufficient to show that there are genuine issues of fact with respect to Karcher's good faith in its investigation and conclusions. It is well-established in this circuit that "“[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (internal quotation marks and alteration omitted); *see also Kendrick*, 220 F.3d at 1231 ("[A] challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff."). Thus, even if the stated reasons later prove to be untrue, the Court examines whether the employer believed those reasons and made a good faith decision at the time of the discharge. "The reason for this rule is plain: our role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v.*

---

[8]As part of this theory Plaintiff asserts that during the investigation, Mr. Aranda was noting and recording the serial numbers of various computers and told Plaintiff that the screen prints had not come from Plaintiff's computer. Because the report of the investigation does not contain this information, Plaintiff contends that Mr. Aranda might have withheld this exculpatory evidence in an effort to incriminate Plaintiff.

*Dillon Comp*., 468 F.3d 1243, 1250 (10th Cir. 2006) (citations omitted).

Plaintiff's evidence does not show that the decisionmakers did not honestly believe that Ms. Sandoval lacked the knowledge to alter her own records or that they had compelling reasons to believe that someone other than Plaintiff had done so. Plaintiff's speculative theories about who might have changed the records do not address the central reason for the termination – the company's belief that Plaintiff had improperly printed out confidential employee time records and given them to unauthorized employees in order to get Ms. Sandoval in trouble. Plaintiff argues that Karcher should have done a better job of protecting the confidentiality of these documents; this, however, is not suggestive of pretext. Plaintiff also asserts that Ms. Mendez should not have been believed because she initially lied about where she got them and Plaintiff was trustworthy. The Court will not second guess the employer's credibility determination here, particularly since it was apparent that Ms. Mendez could not have obtained the documents on her own and there is no evidence to suggest that the company did not genuinely believe that Plaintiff had given Ms. Mendez the documents.

Plaintiff's other theories also do not demonstrate that the investigation was a sham to cover up illegal discrimination. Plaintiff's conjecture that Mr. Aranda might have framed Plaintiff for his own hypothetical misconduct, even if true, would show only that Mr. Aranda was motivated by self-interest to cover up his edits of Ms. Sandoval's records[9], not that the decision was based on Plaintiff's race. Plaintiff's contentions about areas the investigation could or should have been improved also does not show that the investigation was obviously unreasonable. The company had an adequate basis to pursue the allegations against Ms.

---

[9]Moreover, the evidence shows that Mr. Aranda was not present when the time records were altered on July 13.

Sandoval and to try to discover how Ms. Mendez obtained confidential documents and the evidence discovered implicated Plaintiff. Other persons were ruled out based on evidence and reasonable inferences and Plaintiff's speculation about what could have been discovered does not show bad faith. Finally, evidence obtained in this litigation that was not given to the investigators at the time is not probative of the employer's motivation at the time the decisions were made. Plaintiff's facts, disputed or undisputed, are insufficient to carry his ultimate burden of showing that the decision was based on race discrimination rather than an honestly held belief that Plaintiff had engaged in misconduct.

**B. Wrongful Discharge in Violation of Public Policy**

Karcher also moves for summary judgment on Plaintiff's wrongful discharge in violation of public policy claim, arguing that Plaintiff's facts fail to state a claim under this legal theory. "[A] plaintiff may state a claim for retaliatory discharge in violation of public policy by alleging that he or she was employed by the defendant; that the defendant discharged him or her; and that the defendant discharged him or her in retaliation for exercising a job-related right or performing a specific statutory duty, or that the termination would undermine a clearly expressed public policy." *Kearl v. Portage Env'l, Inc.*, 205 P.3d 496, 498 (Colo. App. 2008). Karcher argues that Plaintiff cannot demonstrate that he engaged in any conduct that was protected by "clearly expressed" public policy. In response, Plaintiff argues that he engaged in "whistleblowing" with respect to possible work record alteration.

In general, a party asserting a claim for wrongful discharge in violation of public policy must allege that the policy truly impacts the public. *Kearl*, 205 P.2d at 499. As noted by Plaintiff, Colorado courts have interpreted this to mean "matters affecting society as a whole, rather than the personal or proprietary interests of the parties; actions which strike at the heart of

a citizen's social rights, duties, and responsibilities; and actions by an employer which lead to an outrageous result clearly inconsistent with a stated public policy." *Hoyt v. Target Stores*, 981 P.2d 188, 191 (Colo. App. 1998).

Here, viewing the evidence in the light most favorable to Plaintiff, it shows that the Plaintiff brought the company's attention to a single employee who the Plaintiff believed was altering time records. Plaintiff contends his actions in this regard amounted to the exercise of a "job related right" or the enforcement of a public policy to report fraudulent conduct involving wages paid.

Whistleblowing as a basis for a wrongful discharge claim has most often been recognized in Colorado where the *employer* is engaged in fraudulent or wrongful conduct (and/or direct the employee to engage in illegal conduct) and the employer retaliates against the employee for reporting or refusing to go along with it. *See, e.g., Coors Brewing Co. v. Floyd*, 978 P.2d 663 (Colo. 1999); *Kearl; Hoyt; Webster v. Konczak Corp*., 976 P.2d 317 (Colo.App. 1998). However, in one published case, a division of the Colorado Court of Appeals determined that a Colorado statute declaring the need to combat insurance fraud provided an expression of public policy upon which a claim of wrongful discharge could be based. *Flores v. American Pharm. Servs., Inc*., 994 P.2d 455 (Colo. App. 1999). Therefore, an employee who claimed that she had been fired in retaliation for investigating and reporting a co-worker's insurance fraud could establish the public policy element of her claim. *Id*. at 459.

Plaintiff has pointed to no statute or other expression of public policy that shows that there is a public interest in preventing an employee from being paid for hours not worked. The statutes and policies cited by Plaintiff are all directed at protecting *employee* rights to payment for work performed and other legally protected benefits. The alleged falsification here did not

implicate the rights of employees to be properly paid, which is clearly a matter of public interest, but the profits of that employer, which more properly is characterized as the "personal or proprietary interests of the parties." Moreover, there is no evidence upon which a reasonable jury could find that Karcher discharged Plaintiff in retaliation for reporting that Ms. Sandoval's time records had been altered. The evidence shows that the termination was based upon a credible belief that Plaintiff himself had made the alterations and taken other improper actions in an effort to make it appear that Ms. Sandoval had not reported her time correctly.

Accordingly, Defendant is entitled to summary judgment on this claim.

**IT IS THEREFORE ORDERED** that

(1) Defendant's Motion for Summary Judgment **(#31)** is **GRANTED**.

(2) The Clerk of the Court shall enter judgment in favor of Defendant and against Plaintiff on all claims.

(3) Defendant may have its costs.

Dated this 2nd day of September, 2011

**BY THE COURT:**

Marcia S. Krieger

Marcia S. Krieger
United States District Judge